UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Michael Cortez,<br><br>    Plaintiff,<br><br>    v.<br><br>Stillwell Ready-Mix and Building Materials, L.L.C., Stillwell Ready Mix L.L.C., Stillwell Realty Group, L.L.C. & Vito Gargano,<br><br>    Defendants. | **AMENDED COMPLAINT**<br><br>Case No. 20 cv 7775 (AKH)<br><br>Jury Trial Demanded |

Plaintiff, by and through his attorney, Gregory Antollino, states as follows:

1. Michael Cortez is a gay man who worked for almost two years at Stillwell Ready-Mix and Building Materials ("Stillwell"), an entity owned and operated by Vito Gargano (and family).

2. "Stillwell" we refer to in the collective insofar as Plaintiff worked among all aspects of this family business - both the construction and real estate sides. The LLC without "and Building Materials" refers to (a) Stillwell Ready-Mix and Building Materials, L.L.C., which is, upon information and belief, the umbrella corporation that works in hand with (b) Stillwell Ready Mix L.L.C. The latter corporation was referred unofficially as "Stillwell Redi Mix," and was where cement was mixed. The official location of both entities is 2453 Stillwell Avenue, though the cement mixing took place at "The Plant," located at 2609 13th Street, basically around the corner. Plaintiff worked for both entities. The Real Estate business, "Stillwell Realty," plaintiff regularly did modest tasks such as interfacing with prospective tenants.

3. For some reason – and there could have been several – Gargano perceived Mr. Cortez to be gay. To be assumed gay was nothing new to the 31-year-old Cortez. He speaks in a deep voice but uses his hands expressively and was known to manage a flower business. Cortez did not "come

1

out," as that term is understood, to Vito until the very end. Nevertheless, Michael was continually harassed about his perceived (and actual) sexual orientation, from the date of his first interview until Gargano fired him. The harassment happened over a course of two years, with a hiatus when plaintiff was out due to an injury.

4. The final blow came when Michael brought his boyfriend to the company Christmas party. Even though heterosexual employees were allowed to bring their opposite-sex partners, Cortez was marginalized at the holiday party.

5. Publicly identifying as gay by bringing a boyfriend to an office party, rather than suffer in silence, was the last straw for Gargano. He fired Cortez shortly after that. But this was not before Cortez finished training two new workers. Upon information and belief they are heterosexual and were hired in his place. Gargano planned Michael's termination right after the party, by bringing in the new workers, then let plaintiff go on the pretext – as Gargano stated – that Cortez mistreated his customers. In fact, Gargano had complimented this exact skill just months earlier.

## **JURISDICTION & VENUE**

6. Jurisdiction exists under federal question jurisdiction, specifically Title VII.

7. Venue is proper in this District under 28 U.S.C. §1391(b)(3) in that Both Stillwell Ready Mix and "The Plant," and its principal conduct business in this District. They are therefore subject to personal jurisdiction here. More specifically, just as an example, Stillwell did work for Habitat for Humanity, Restaurant Solutions, and Foremost Contracting, all of Manhattan. In addition, Stillwell advertises for work in the Hudson Valley, which is part of the Southern District. Plaintiff to date has not discovered whether Stillwell Realty does business outside of Brooklyn. If it does not, plaintiff will revisit whether venue for the

Realty Group – upon information and belief a franchise of the REMax Group – is proper in this district. REMax does business in this district, however.

## PARTIES

8. Stillwell – again the umbrella corporation and the Plant – is mainly a construction company doing business in the seven figures all over the country, including this District. Gargano lives in Brooklyn, and Plaintiff, who lives on Staten Island, worked at Stillwell for about one and a half to two years; he took some time off because of congenital disability and then returned after he recovered.

## FACTUAL ALLEGATIONS

9. On April 3, 2018, the date of plaintiff's interview for the job, Gargano hired Cortez as a "jack of all trades" – some construction, some realty, much administrative work. The office needed someone – as it was reported to Plaintiff – who could get along with Plaintiff's "Uncle" Vincent, who was an Uncle in the familiar way, with a connection to a marriage.

10. Uncle Vincent told Gargano that he and Cortez got along. Others (apparently) had difficulty working with Vincent, so that was one reason Gargano hired Cortez. The nature of the family relationship between Vincent and Cortez – by marriage – was not revealed at the interview; Vincent and Cortez wanted to avoid any charges of nepotism, even in a family business.

11. Cortez got the job, but as he left the office, Gargano told him, "Do not wear a wig to work tomorrow." (He had not been wearing a wig that day, for the record.)

12. April 4, 2018 was Michael's first day at work. Gargano asked him, "Where is your wig?" This day was the beginning of a long string of Michael's being subject to epithets, micro- and macro-aggressions that occurred during his tenure there.

3

13. Again, Plaintiff once worked in flowers – real flowers and flowers with paper or other materials. On April 5, 2018, Cortez brought flowers to work that he made by hand to break the ice and in the hope that the quick-on-the-tease conversation would stop.

14. He offered them to Gargano's daughters and those of his brother Jerry Gargano, and he offered to make more for the Easter Holidays.

15. Bringing flowers as a form of pleasantry was what Plaintiff had to offer; it was an artistic skill; he wasn't offering flowers to the men. Perhaps he should have suspected their reaction: The Gargano's gave Cortez a look of disgust. Vito said, "You made that by hand? You sure you want to work in this manly place? Would you be happy working at a female flower shop since you're that soft?"

16. Plaintiff went back to his duties and did not respond but was disturbed by the reaction.

17. On April 7, 2018, Gargano continued bullying Cortez. Vito liked to tease, especially in the morning when Cortez went to the bathroom. Gargano said more than once words to the effect that, "Michael is shitting his flowers away." Comments such as this were a near-daily occurrence.

18. On April 12, 2018, Vito told Cortez, "We use the bathroom at home, so we don't use the bathroom at work."

19. Cortez replied with words to the effect: "I live on Staten Island and work in Brooklyn, so I need to use the restroom here."

20. This restroom idiosyncrasy Gargano could not shut up about, as inane and childish as it was. Indeed, Gargano and his driver, Angel Rosado, occasionally turned the lights off when Cortez was in the bathroom – the light switch was outside the bathroom door.

21. On April 14, 2018, Vito and Angel teased Cortez and Uncle Vincent (whom the company still did not know were related, as did not need to know). Gargano said they *shtuped* each other, though the Yiddish was not employed.

22. When Vincent dropped his pen and bent over to pick it up, Vito said, "Michael, give him his pen, then slide it in his backside as you like it."

23. Vincent replied, "I am not gay. I don't do that like that."

24. On April 15, 2018, Plaintiff was putting away concrete blades on the bottom shelf at the headquarters. As he did so, he kneeled. Gargano later said: "I saw you like being on your knees.

Men squat; women go on their knees, so I know what female role you play."

25. Starting around April 16, 2018 (and continuing the rest of the month), Vito reminded Cortez of the bathroom: "We use the bathroom at home, not at work." He made it even more intimidating by adding, "Stop taking it up the ass from [Vincent], and you won't need to use the bathroom so much."

26. For whatever reason, even though OSHA requires a bathroom facility in almost any workplace, Gargano had a problem with employees using the bathroom while Gargano was there. Whatever his motives, they were not legal, and Gargano slipped in homophobic jokes among the scatological discussion. Likely, the restroom was an excuse to make homophobic comments.

27. Vito added to Plaintiff, "Stop giving it too hard to Vinny so he will stop using the bathroom. . . . . Mike, what did you do to Vinny? You fucked him so hard that he can't shit right." Gargano made this comment on more than one occasion.

28. As it happens, Vincent has a health condition; the medicine he takes to alleviate the condition causes his need to use the bathroom more than Gargano preferred.

29. On May 1, 2018, the workplace became busy, as the industry does in the spring. Cortez came in, said "Good morning" to Gargano, clocked in, did his work, and throughout the day, Vito made remarks about Cortez and his uncle (and the imaginary relationship between the two), but

Cortez focused on work (if under stress) then clocked out.

30. On or about May 14, 2018, Vito said, "Michael are you pegging Vinny again" Cortez didn't know until after he looked it up that "pegging" carries one meaning of using a dildo for sexual penetration where a woman uses the dildo as a prosthesis.

31. Some customers saw how Vito spoke to Cortez and not all, but most of Vito's associates referred to Cortez as a "Spic." They saw Vito speak to Cortez in a bullied, sexual way, and perhaps they were too timid to refer to Michael's sexuality. But Cortez is LatinX, as his name implies.

32. In June, July and August 2018, there was a high workload. Cortez and Vincent dealt with customers in the front office, and handled telephone calls, inquiries, and emailed questions from vendors. Or they handled purchase orders that needed to place. Neither ever got a break – not even lunch – and when they tried to leave for lunch or order food, Vito had a problem with that.

33. For the rest of 2018 and part of 2019 (when Cortez was employed there), there were only Cortez and his uncle – there were no new hires – to handle administrative work. They handled it fine, but there was no overtime and there was no exemption from overtime.

34. As Cortez left for the day, Vito often said words to the effect of, "I didn't let you out your cage. Get back to work." Cortez replied, "I am going to lunch." Gargano retorted, "We don't get lunch here – you're here to work."

35. As a result, Cortez never got a pure lunch break as required by state law. Lack of a noonday meal was problematic as it was Cortez's first time working a full-time job. His uncle never ate much, so Cortez thought that it was normal to skip lunch and he snuck some food while no one was looking and went along with Gargano's restriction.

36. Cortez worked a 6-day, 10-hour shift with no break or lunch. He had to eat some semblance of lunch at his desk and never leave his post for 10 hours.

37. Cortez needed to eat because if he didn't take daily medicine required for a congenital disability (Osgood Slater's Disease), it hurt his stomach. And he would have joint pain back and couldn't walk or move as well as otherwise. The medicine, like many medicines, required he take it on a full stomach.

38. Though we cannot calculate Cortez's unpaid hours with precision at this time – and given that the employer must keep hourly work records. Plaintiff (a) worked at the defendant(s) for 1.5 years; (b) worked ten hours daily without lunchtime (it was occasional if discouraged); and (c) worked six days a week. As such plaintiff estimates he worked three hours unpaid overtime per day (straight time or time and a half); and (d) he is due approximately 5544 hours of unpaid compensation, including liquidated damages.

39. His job was FLSA non-exempt, and the type of work he did was not of the managerial level that would allow defendants an exemption. He was paid $150-160 per day, which, given the hours he worked, barely met the minimum wage.

40. In September through October 2018, Vito often told Cortez to stay home because work was slow. He had to use sick and vacation days; otherwise, he wouldn't get paid. Gargano made do with Plaintiff's uncle.

41. In November 2018, Vito urged Plaintiff to "help Vinny in the bathroom." This statement was another churlish microaggression. When Cortez ignored the statement, Gargano pressed the matter, speaking in irony, even if grotesque: "That's not right – you have to help Vincent out." 42. Vito Gargano commented to Uncle Vincent on a morning in December 2018, "Mike Cortez left you a hundred dollars under the toilet seat for you."

43. Later that month, Gerald (Jerry) Gargano, Vito's brother, commented: "All faggots need to be put into the cement mixer because there is no evidence [of their death] when the cement hardens."

44. Jerry Gargano also said, regarding one of the company's drivers: "He probably sat in the back of the oven because he's black and Jewish." The driver was a Black American and wore the Star of David.

45. The first Christmas party was that month, December 2018. Cortez did not go, even though his uncle asked him. But Michael was in fear of his employers, their family, and other coworkers finding out more details about his sexual orientation. He didn't want to go alone.

46. In January 2019, Cortez didn't work much because it was slow until February. Gargano told Cortez to use his sick days again.

47. Before he returned on or about February 13, 2019, Cortex learned that Vito has asked his coworkers if Cortez was gay. This information was according to driver Angel Rosado and Uncle Vincent.

48. Vito apparently asked Vincent, "If Michael is gay – just asking?" Cortez said to Vincent, "pay him no mind." He signaled he was gay, but for reasons unknown, Gargano wanted to know for sure.

49. On February 26, 2019, a woman fell in the warehouse bathroom. Cortez informed Vincent and Gargano what has happened. Gargano told Cortez to stay at the front desk because "You don't know what to do with a slice of pussy when you see it."

50. Gargano made this statement in front of the workers who saw Vito pick on Cortez, and not only was it humiliating, at least seven workers, even Cortez's "Uncle," started to bully Cortez for his sexuality. Vincent said, "Maybe we should do training on her since she's already gone." This statement did not make perfect sense. For sure, it was a sexist slur.

51. Vincent told Vito about the woman, and Angel Rosado responded, "Queers do not know what to do with a real woman, but maybe she will turn you into a man."

52. On February 26, 2019, Michael left work for medical reasons. He had fallen after tripping over the forklift, an event recorded on the work camera that recorded Cortez limping away. Gargano and others disregarded the injury because they didn't want the worker's compensation hassle. Gargano said, "You're young; you'll recover." The next few days were nevertheless hard for Cortez, and his doctor advised him to rest (as well as look for a new job, which Cortez eventually did).

53. On March 2, 2019, Plaintiff emailed a resignation letter to Anna Gargano, Vito's wife; she was the Human Resources arm of the corporation.

54. Plaintiff got a job with the U.S.P.S. and had five days' orientation. Cortez worked there but had to stop because the pain in his legs worsened. Cortez also consulted a doctor for

surgery to remove a benign tumor. Because of his injury and surgery, in June 2019, Michael resigned from the Post Office.

55. In July, August, and September 2019, Michael worked nowhere; instead, he had surgery, then recovered and recovered from his fall.

56. By October 2019, Vincent asked Cortez to come back to work. The store needed and extra worker. Plaintiff needed to pay his bills and agreed.

57. The interview date was October 9, 2019, at which time Vito commented, "Cortez should use the 24-quick-mixer – a concrete mixer and "use it on Vincent." The intelligence of this comment might not quite make sense, but upon information and belief, this was a play on his Gerald Gargano's earlier word about putting gay people in concrete.

58. The next day was his first day of return to work. Vito commented to Cortez the he "should find a tool to shove up [a] coworker's butt." Vito pointed toward hammers and chisels.

59. Shortly thereafter, Angel Rosado flashed Cortez a video of a trans man on his phone, saying, "You would let that smash you." (Meaning Plaintiff would allow the man to have intercourse with him.)

60. Vito then shared a story about a former employee who had a sexual experience with a transgender person.

61. Within a month, Vito asked plaintiff "to check the bathroom for cleaning." There, he found a dildo on the wall behind the door of the bathroom. The dildo (jet black in color) appeared regularly at work as a childish mockery.

62. Days after that, Vito asked, "Mike, check the elevator room for the broom." He entered the bathroom to see the dildo hanging on the inside door (it had a suction device at its base). A note was attached, reading, "Wash your hands after use."

63. In December, Vito began discussing which workers he should invite to attend the annual Christmas Party.

64. Vito and Angel joked with the idea that "If Cortez brought a man to the party…" – suggesting that it would be a bad situation. Cortez stayed silent because he didn't want to exacerbate the bullying.

65. But he spoke to his boyfriend that day and asked if he would come with Cortez to the party, which was to be held on December 21, 2019.

66. Cortez wanted to stand up to the hostile atmosphere, but his strategy backfired. Matters got worse. Gargano purposefully ignored Michael's guest and disregarded Cortez – certainly not in the spirit of a holiday party.

67. Vito had seen Michael's boyfriend, Yusuf, approximately three times at work, as Yusuf came in periodically and the two the premises for a fast-food lunch. Vito likely knew this gentleman was his boyfriend.

68. At the Holiday party, the hosts sat Cortez and Yusuf at the table, on the left side of the room; his Uncle, his Uncle's date and Angel and his wife were far from everyone else.

69. The table could have fit ten people, but Vincent and Angel sat far from Michael and his boyfriend. Everyone at the table ignored them, and they wanted to leave. They did after the food was served at approximately 11:30 PM.

70. After the New Year, Vito commented on how friendly Cortez was to the "black customers and vendors" who came into the store. This observation started harassing comments again.

71. Vito and Angel told him, "There is a gift waiting on your desk; you should put it away after you use it." Indeed, the workplace dildo was stuck on his desk.

72. Shortly thereafter, Vito said "Cortez should give my lollipop [the dildo] to" Vincent and Angel "because they are making love in the back warehouse."

73. Vito then commented, "Go join my coworker and driver in the back and give them the lollipop." He made a "jerk-off" gesture with his hand.

74. Vito said of the dildo, "Don't you like the gift? It's your favorite color."

75. He repeated the hand gesture the next day.

76. Later in January 2020, a coworker told every customer, "Happy Monkey Day." The reference, sadly, was to Martin Luther King Day. It was just a horrible place to work, and Vito sanctioned such comments.

77. Vito soon learned that Cortez was related to Vincent (if only by a former marriage). He then placed all the work that Vincent had on Michael's desk. There was no help, and they just gave more and more work to Cortez. It was a harassment of a different sort, but Michael got the jobs done. Plaintiff was never evaluated, therefore could not have received a bad one.

78. Vito said to a vendor before Cortez, "I'm going to bust your ass," gesturing to the vendor's derriere.

79. At the end of the month, Cortez was feeling ill because of abdominal cramps, which resulted from the medication. Cortez did not have a chance to eat, and he told Vito about the issue.

Gargano retorted, "Aw, Michael don't feel good!"

80. In February 2020, Vito hired more help, including Edwin Pena and Syed Ali. Cortez trained each of them. Vito also spent time after work with Syed, then cut Cortez's hours from six days a week to four days a week.

81. Cortez got ironic comments from Ali, likely suggested by Vito, "I like your lips." Ali was not gay.

82. On another day, Vito yelled at Cortez throughout the day for Vincent's work, on a day Vincent was not in, even though Michael had nothing to do with Vincent's work. Harassment of a different sort.

83. Further in the month, Vito yelled at Cortez because both Vito and his son looked up the distance from Cortez's home to work. Vito yelled at Cortez to come in earlier than the established work time.

84. Vito made fun of Plaintiff's hair because he pulled it up away from his face. Vito said, "Who scalped you? Are you growing a handle?"

85. Syed Ali continued to comment on Plaintiff's lips and his looks, again saying, "I like your lips." He mentioned the dildo and say that he and Edwin (another new guy) would use it on each other.

86. Ali and Angel Rosado put a parking ticket on the Plaintiff's car, saying Cortez had gotten "a ticket for being queer."

87. In March 2020, at approximately 8 AM, a woman, Sandy, from accounts receivable approached Cortez at the front counter, amongst the other workers, and discussed how "Vinny needs to explain his actions with the job." It was a reference to Cortez's position and job security.  88. At the end of the workday, Cortez met first with Jerry Gargano in the conference room with Anna Gargano present by phone. Jerry Gargano told Cortez, "due to what's going on around the world . . ." He was about to mention COVID. But then he stopped, adding, "You know what, let's wait for my brother to get here."

89. Vito Gargano arrived, sat down and said, "I'm unsatisfied with how things are going on around here, how you treat my customers, how you treat me. I'm just gonna have to let you go." 90. Cortez disagreed with these pretextual reasons for firing Plaintiff. (Indeed, Gargano could probably have used a more believable pretext as Jerry was about to. But he wanted to harm Cortez's reputation and feelings.

91. Nevertheless, Cortez handled the matter professionally and told everyone present that it had been a pleasure. They shook hands as Cortez exited, who now sues for redress.

FIRST CAUSE OF ACTION
TITLE VII – DISCRIMINATION ON THE BASIS OF SEX
(STILLWELL)

92. Plaintiff repeats all previous paragraphs as if set forth herein.

93. Defendant discriminated against plaintiff based on his sexual orientation.

82. Because of the preceding, plaintiff has suffered damages.

SECOND CAUSE OF ACTION
TITLE VII – HOSTILE WORK ENVIRONMENT
(STILLWELL)

83. Plaintiff repeats all previous paragraphs as if set forth herein.

84. Defendant subjected plaintiff to a work environment that was permeated by insult and ridicule.

85. Because of the preceding, plaintiff has suffered damages.

THIRD CAUSE OF ACTION
VIOLATION OF THE FAIR LABOR STANDARDS ACT
(STILLWELL)

86. Plaintiff repeats all previous paragraphs as if set forth herein.

87. Plaintiff was a non-exempt employee.

88. Defendant willfully misclassified (or just treated) plaintiff as exempt.

89. Because of the preceding, defendant underpaid plaintiff in the amount of approximately 2500 hours, or such amount as shall be proved at trial, plus liquidated damages and attorneys' fees.

FOURTH CAUSE OF ACTION
NEW YORK CITY HUMAN RIGHTS LAW
DISCRIMINATION ON THE BASIS OF SEXUAL ORIENTATION
(ALL DEFENDANTS)

90. Plaintiff repeats all previous paragraphs as if set forth herein.

91. Because of the preceding, plaintiff has suffered damages.

FIFTH CAUSE OF ACTION
VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW
HOSTILE WORK ENVIRONMENT
(ALL DEFENDANTS)

92. Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

93. Plaintiff was subject to a hostile work environment based not only on his sexual orientation, but constant negative references to race, national origin and women in an offensive manner.

94. Because of the preceding, plaintiff has suffered damages.

SIXTH CAUSE OF ACTION
NEW YORK LABOR LAW – WAGE THEFT
(ALL DEFENDANTS)

95. Plaintiff repeats all previous paragraphs as if set forth herein.

96. Under Labor Law § 195, Stillwell was (and is) required to keep records of the times plaintiff arrived and left for work. If it did not – as plaintiff expects – plaintiff's estimates for the amount of time she worked overtime must be accepted as accurate.

97. Because of the preceding, Plaintiff has suffered damages.

SEVENTH CAUSE OF ACTION
NEW YORK LABOR LAW § 201
FAILURE TO POST WAGE REGULATIONS
(ALL DEFENDANTS)

98. Plaintiff repeats and realleges all previous paragraphs as if set forth herein.

99. Stillwell did not post wage regulations following § 201 of the New York Labor Law. 100. Because of the preceding, plaintiff has suffered damages, and defendant owes him such civil penalty and attorneys' fees and damages as the law allows.

EIGHTH CAUSE OF ACTION
NEW YORK LABOR LAW § 162
FAILURE TO ALLOW SIXTY MINUTES FOR NOONDAY MEAL
(ALL DEFENDANTS)

101. Plaintiff repeats and realleges all previous paragraphs as if set forth herein.
102. Defendant did not allow plaintiff a noonday meal – at least non consistently.

103. The defendant has the burden of keeping hours records under Labor Law § 195. 104. Because of the preceding, plaintiff has suffered damages, and defendant owes him such civil penalty and attorneys' fees and damages as the law allows.

WHEREFORE, Plaintiff demands the following relief:

1. Compensatory damages in the form of lost wages and other loss of enjoyment of life;

2. Punitive Damages;

3. Attorneys' fees under the FLSA, the New York City Human Rights Law and Title

VII;

4. Such other relief as the Court may deem appropriate.

Dated: New York, New York
September 30, 2020

*Greg S. Antollino*
Gregory Antollino, Esq.
Antollino PLLC
275 Seventh Avenue, Seventh Floor
New York, New York 10001
(212) 334-7397
gregory@antollino.com